NO. 13-10439

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Appellee/Plaintiff,

    -VS-

LUIS CARLOS VASQUEZ
    Appellant/Defendant.

D.C. Nos. CR-11-2486-TUC-DCB

District of Arizona (Tucson)

_____

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA-TUCSON
HON. DAVID C. BURY

APPELLANT'S OPENING BRIEF

LAW OFFICES OF WILLIAMSON & YOUNG

KATHLEEN G. WILLIAMSON
P.O. Box 249
Tucson, AZ  85702-0249
Telephone (520) 623-8414
Facsimile: (212)537-6683
Arizona State Bar No. 012595
Attorney for Mr. Luis Carlos Vasquez

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ II

INTRODUCTION .................................................................................... 1

    COURT OF APPEALS JURISDICTION ............................................. 6

    STATEMENT OF TIMELINESS ......................................................... 6

    DETENTION STATUS ......................................................................... 6

STATEMENT OF RELATED CASES ..................................................... 6

ISSUES PRESENTED FOR REVIEW ..................................................... 7

STATEMENT OF THE CASE .................................................................. 8

STATEMENT OF RELEVANT FACTS ................................................... 9

ARGUMENT OF ISSUES PRESENTED ................................................ 15

    1.    The Government Intentionally Denied Mr. Vasquez Constitutional Rights to a Fair Trial By Deceiving and Sandbagging Both Defense and District Court That The Government's Impeachable Key Witness Would Be Testifying. ............................................................................................. 15

    2.    An Uncharged Coconspirator's Hearsay Statement Allegedly Identifying The Defendant As A Coconspirator And Admitted Over Defense Objections Was Unfairly Prejudicial and Plain Error. ........................ 25

    3.    Mr. Vasquez Did Not Receive A Fair Trial And Effective Assistance Of Counsel Because The Government Repeatedly Failed To Provide Timely FRCP Rule 16 Disclosure And *Brady* Materials. ................................. 35

    4.    The Cumulative Effect Of the Governments Unfair Tactics and Trial Court's errors denied the Appellant Constitutional Rights to Due Process and a Fair Trial. ...................................................................................... 42

    5.    Improper Government Vouching During Closing Argument Requires A New Trial. ............................................................................................. 44

    6.    The Court Improperly Enhanced Mr. Vasquez's Sentence Under The U.S.S.G. 3C1.1 Obstruction Of Justice Guidelines When The Court Made No Required Findings Of Willful And Material Instances Of Perjury. 47

    7.    The Court Improperly Enhanced Mr. Vasquez's Sentence for U.S.S.G. 2D1.1(b)(1) Weapons Enhancement. ...................................................... 54

i

**8.    The Court Should Remand To Reduce The Sentence Based On The Retroactive Application Of  U.S.S.G. 2D1.1 and 2D1.11.** .................... 56

**9.    Defendant Vasquez Did Not Receive Effective Assistance Of Counsel Where 1) Counsel Failed To Anticipate That The Government Would Not Call A Crucial Key Witness, 2) Failed To Object To The Sentencing Weapons Enhancement, And 3) Failed To Object To Government Vouching.** 59

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS** ........................................................................................ 1

**CERTIFICATE OF SERVICE** ................................................................ 1

**TABLE OF AUTHORITIES**

Cases

Ariz. R. Sup.Ct. 42, E.R. 3.8 ....................................................................22

*Berger v. United States,* 295 U.S. 78, 88 (1935) .....................................22

**Blakely v. Washington,** 542 U.S. 296, (2004), .......................................53

*California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984) ......................................................................................................21

*Chambers v. Mississippi*, 410 U.S.284, 294, 93 S. Ct. 1038 (1973) .......................21

*Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769 (2009) ................................25

*Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142 (1986) ..............................21

*Crawford v. Washington*, 124 S.Ct. 1354, 541 U.S. 36 (2004) ........................ 26, 34

*Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) .......................................24

*Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763(1972) ....................................24

*Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972) ........30

*Greene v. McElroy*, 360 U.S. 474, 496 (1959) .......................................22

*Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555 (1995)...................................24

*Lilly* v. *Virginia,* 527 U. S. 116, 134 (1999) ............................................................34

*Lockhart v. Fretwell*, 506 U.S. 364, 368, 113 S.Ct. 838, 842, (1993)....................60

*Mooney v. Holoha*n, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340 (1935)...............30

*Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1964) ................30

*Smith v. Phillips*, 455 U.S. 209, 219 (1982) ............................................................25

*State v. Cornell*, 179 Ariz. 314, 331, 878 P.2d 1352, 1369 (1994) ........................22

*State v. Rodriguez*, 192 Ariz. 58, 64, 961 P.2d 1006, 1012 (1998) ........................22

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) .60

*U.S. v. Eubanks*, 591 F.2d 513 (C.A.9 (Ariz.), 1979)..............................................31

*U.S. v. Rising Sun*, 522 F.3d 989 (9th Cir., 2008) ...................................................53

*US  v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987)..........................................35

*US  v. Sanchez*, 659 F.3d 1252, 1258 (9th Cir. 2011) .............................................46

*US v.* ......................................................................................................................22

*US v. Alvarez-Lopez*, 559 F.2d 1155, 1160 (9 Cir. 1977)........................................22

*US v. Bagley* ...........................................................................................................24

*US v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985)......................................24

*US v. Barton*, 995 F.2d 931, 933-34 (9th Cir. 1993) ...............................................41

*US v. Bibbero*, 749 F.2d 581, 584 (9th Cir. 1984)...................................................32

US v. Birtle, 792 F.2d 846 (9th Cir.1986) ..............................................................60

*US v. Bonds*, 11-10669, April 22, 2015 ...................................................................53

*US v. Booker*, 543 U.S. 220 (2005)..........................................................................52

*US v. Castillo–Marin*, 684 F.3d 914 (9th Cir., 2012)..............................................49

*US v. Castro-Ponce* (No. 13-10377 - 9th Cir., 2014) ..............................................48

*US v. Castro-Ponce*, 770 F.3d 819, 823 (9th Cir. Ariz. 2014) ...............................51

*US v. Cordova Barajas*, 360 F.3d 1037, 1043 (9th Cir. 2004)...............................48

*US v. Dunnigan*, 507 U.S. 87,  113 S. Ct. 1111 (1993).........................................50

*US v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979)..................................................32

*US v. Fielding*, 645 F.2d 719, 727 (9th Cir. 1981) .................................................32

*US v. Jackson*, 84 F.3d 1154, 1158 (9th Cir.1996)..................................................46

*US v. Layton*, 720 F.2d 548, 556 (9th  Cir.................................................................32

*US v. LiCausi*, 167 F.3d 36, 50 (1st Cir. 1999) ......................................................33

*US v. McElmurry*, 2015 WL 305274, (9th Cir. Jan. 26, 2015) ...............................62

*US v. Molina*, 934 F.2d 1440, 1446 (9th Cir.1991) .................................................59

*US v. Moore*, 522 F.2d 1068, 1077 (9th Cir. 1975) .................................................31

*US v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007).................................................33

*US v. Moran*, 493 F.3d 1003, 1010 (9th  Cir. 2007)................................................32

*US v. Olsen*, 737 F.3d 625 (9th Cir., 2013) ............................................................25

*US v. Olson*, 925 F.2d 1170, 1173 (9th Cir.1991) ..................................................60

*US v. Pineda-Doval*, 614 F.3d 1019, 1032 (9th Cir. 2010) ....................................26

*US v. Routon*, 25 F.3d .............................................................................................56

*US v. Salgado*, 250 F.3d 438, 449 (6th Cir. 2001) .................................................33

*US v. Sayakhom*, 186 F.3d 928, 943 (9th Cir. 1999) ........................................ 15, 35

*US v. Smith*, 962 F.2d 923, 933-34 (9th Cir.1992), ................................................45

*US v. Torralba-Mendia*, 2014 WL 1903831 (9th Cir. Apr. 28, 2015) ................38

*US v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) ...................................................33

*US v. Vera,* 770 F.3d 1232 (9th Cir. 2014) ............................................................38

*US v. Wales*, 977 F.2d 1323 (9th Cir. 1992)...........................................................58

*US v. Wales*, 977 F.2d 1323, 1327-28 (9th Cir. 1992) ............................................57

*US v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1992) ...........................................23

*US v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993).....................................................42

*US v. Young,* 470 U.S. 1 (1985).............................................................................23

*Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920  (1967) ..............................21

*Williams*, 989 F.2d at 1068 ...................................................................................32

## Statutes

18 U.S.C. § 3582(c)(2). App. B pp. 3-4....................................................................58

18 U.S.C. § 3742 ......................................................................................................6

18 U.S.C.§ 3582(c)(2)...............................................................................................58

28 U.S.C. § 1291 ......................................................................................................6

28 U.S.C. §1294 .......................................................................................................6

U.S.S.G  2D1.1 and 2D1.11 ....................................................................................7

 **U.S.S.G. 2D1.1(b)(1)**..........................................................................................1, 61

U.S.S.G. 3C1.1 ................................................................................................. 1, 6, 51

## Rules

ABA Model Rule of Professional Conduct 3.8(d) (2008).......................................25

Fed R. App. P. 32(a)(6)...........................................................................................1

Fed. R. App. P. 32 ...................................................................................................1

Fed. R. App. P. 32(a)(5) ...........................................................................1

Fed. R. App. P. 32(a)(7)(B) ......................................................................1

Ninth Circuit Rule 28-2.6 .........................................................................6

## Other Authorities

18 USC §3553 ..........................................................................................49

U.S. Const. amend. VI ...................................................................... 34, 60

U.S. Const. amend. XIV ...........................................................................21

U.S.Const. amend.VI ...............................................................................21

U.S.S.G § 2D1.1 .............................................................................. 56, 59

U.S.S.G §2D1.11......................................................................................56

# INTRODUCTION[1]

This case is important because it highlights prosecutorial and judicial practices that individually and cumulatively denied United States Customs and Border Patrol (CBP) Agent Luis Carlos Vasquez a fair trial and sentence. Agents currently protecting our borders need to be accorded assurances of a fair trial when drug dealers and liars claim that agents are corrupt.

Luis Vasquez had an unblemished career as a Customs and Border Patrol Agent[2] and was described by his co-agents as trustworthy professionally and personally.[3]

An unrelated wiretap on codefendant Lizarraga-Roldan (aka "Mala Cara" – ugly face in Spanish) picked up phone calls about an unidentified border agent from co-defendant Stuppi. Vasquez defended that Stuppi made fraudulent representations to Mexican drug dealers that Stuppi had a corrupt agent at the port so Stuppi could profit.

On June 17, 2011, undetected marijuana came through Agent Vasquez's assigned lane, driven by codefendant Chavez- Bustamante who parked it at

---

[1] "ER" is used to refer to Appellant's Excerpts of Record. "CR" will be used to refer to the Ninth Circuit Clerk's Record. "RT" refers to Reporter's Transcript
[2] ER Vol.5 p.276; RT 10/12/12, p.186.
[3] ER V4, p.1-50; RT 2/12/13, pp. 149-192 – 4 CBP Officers Character Witnesses and 1 Softball Coach Father Character Witnesses for Vasquez……………1

codefendant Prieto's house in Douglas. Based on surveillance, the house was secured and searched.

Mr. Vasquez's routine communications with Stuppi were reinterpreted by the Government as complicity in this conspiracy. In the first trial, Stuppi was impeached on cross-examination[1] and by impeachment witnesses,[2] including Stuppi's mother, sister and brother. A 9-3 jury mistrial resulted. The first trial was described by the trial judge as a "swearing match" between Stuppi and Vasquez.[3]

At the second trial, the Government deceived the Defense and trial court that Stuppi would testify, knowing the Defense relied on impeachment of the "face of the Government's case" as defense counsel described Stuppi nine times in opening statements.[4] Significant Brady material was disclosed late just before the second trial that the Government promised to expose as part of their direct examination of Stuppi.[5] In deciding the *Brady* motions and motions to continue, the court also relied on the Government's representations that Stuppi would testify and that the

[1] ER Vol.4, p. 118; RT 10/9/12 and 10/12/12; Dkts 253, 248
[2] ER Vol.3, pp. 208-250; RT 10/11/12 pp. 130-177
[3] ER Vol.4, p.142; RT 10/15/12, pp.1-3, Dkt.251 "it's not a complex case. One could describe it really as a swearing match, a decision a jury has to make as to whether or not they believe the defendant and his testimony or to put it another way whether or not they could believe witness Stuppi to the extent that they would want to hang a guilty finding on his testimony."
[4] ER Vol.4, p.51; RT 2/5/13, p. 45-65.
[5] ER. Vol.3, pp 129 and 134; Renewed Motion Continue - Email Exhibit, 2/4/13; Dkt.315-1. See also ER Vol.3, pp. 89; RT 2/7/13, pp. 4-7 Government Again Represents to Court They Will Call Stuppi And Provide Brady. See also ER. Vol. 4, pp. 45-52; RT 2/4/13. pp. 3-8.

Defense was prepared to impeach Stuppi.[1] The Government ambushed the Defense with a non-testifying Stuppi, a "phantom"[2] witness through phone conversations and coconspirator hearsay statements , denying effective counsel and confrontation rights.

Despite numerous frustrated written and oral attempts to receive *Brady* during both trials, the prosecution engaged in a steady practice of providing prejudicially late disclosure or simply not providing it at all.  Two weeks before the second trial, the Government disclosed thousands of pages of disclosure which also contained late FRCP Rule 16 and *Brady* materials.[3]  The trial court denied motions to continue and preclude and merely repeatedly reminded the prosecution of their *Brady* obligations.

At Stuppi's sentencing, the Government, James Lacey, gloated over how he successfully deceived the Defense and deprived the jury of impeachable witnesses

---

[1] ER Vol.3 p.89; RT 2/7/13, pp. 4-7; ER Vol.

[2] ER. Vol.3, p.1 RT 5/1/13; Dkt.466. Sentencing Victor Stuppi, specifically ER 12-23, RT 9-20

[3] A sampling of this ongoing struggle for disclosure and Brady is in ER Vol.3 Dkts. 71, 169, 289, 305, 315 (the motions are worth reading for the Brady story in this case) and nevertheless, even after a first trial, the trial court is repeatedly orally ordering the Government to make Brady disclosures about key evidence during the trial: See egs., at RT 1/31/13, RT 2/5/13 p. 218, RT 2/7/13 p.4.

and evidence that Stuppi was a fraudulent liar.[1] Late disclosure before the second trial included that Stuppi committed perjury in the first trial.[2]

Over strenuous objections, Prieto provided coconspirator hearsay of a declarant, an uncharged ex-boyfriend, Tiznado, supposedly pointing out Vasquez as a dirty agent, however, late disclosure showed Tiznado denied this.[3] Non-cooperating codefendant Lizarraga-Roldan, the major organizer and drug smuggler, received a sentence of 84 months. In all but the Vasquez case, the court rejected weapons and perjury enhancements, reasoning explicitly that Vasquez's CPB issued gun was not present for purposes of the drug smuggling.[4]

All cooperating codefendants -- all smugglers -- received probation or time-served. Mr. Vasquez, however, with a Criminal History category 1 was sentenced to 151 months[5] because he went to trial and testified to a lack of knowledge about Stuppi's scam. Probation recommended a sentence of 121 months concurrent.[6] The court stated that the Government's case was all circumstantial evidence and coincidences but, without finding any specific instances of perjury or obstruction, increased Mr. Vasquez's sentence from "six to six and a half years just based

[1] ER. Vol.3, p.1 RT 5/1/13; Dkt.466. Sentencing Victor Stuppi,
[2] ER Vol.3, p.89; RT 2/7/13 pp 4-7
[3] ER Vol. 1, p.59, RT 2/5/13 p.1-9. 217-8

[4] ER Vol. 3, pp. 1-88
[5] ER Vol.1, p.3; Dkt 430
[6] EOR Under Seal, p.17

purely on the quantity of the drug and the purity" to 151 months due to the court's non-specific finding of perjury.[1]

Implicit in the Vasquez defense is that approximately 90% of the marijuana that enters the United States POEs is undetected by honest border patrol agents.[2] An agent could be accused of corruption based on coincidences and false representations by people like Stuppi and liars who would avoid any prison time by testifying in accordance with agenda of the government.

---

[1] ER Vol.1, p.22; RT 8/19/13 p.6; Dkt. 460.

[2] "The same ports of entry that serve as a pipeline for economic growth are inundated by illegal drug shipments. According to the Department of Justice, more than 90% of all illicit narcotics come into the United States through official ports of entry hidden among cargo and travelers."  Statement of Chairman Michael T. McCaul (R-TX) Subcommittee on Oversight, Investigations, and Management Field Hearing "Using Technology to Facilitate Trade and Enhance Security at Our Ports of Entry" May 1, 2012 Remarks as Prepared http://homeland.house.gov/sites/homeland.house.gov/files/05-01-12%20McCaul%20Open.pdf
Caleb Mason, former prosecutor and law professor estimates that less than 10 percent — possibly just 5 percent — of drug mules are caught. http://usnews.nbcnews.com/_news/2013/05/30/18589533-experts-say-drug-mules-are-easy-to-find-hard-to-catch?lite.
"…evidence does suggest that being caught is quite unlikely. In particular, a rough "back of the envelope" type calculation suggests it is on the order of 5-10%.
David Bjerk and Caleb Mason,  **The Market for Mules: Risk and Compensation of Cross-Border Drug Couriers**  Discussion Paper No. 8224, May 2014, Institute for the Study of Labor (Forschungsinstitut zur Zukunft der Arbeit).

**DISTRICT COURT JURISDICTION**

The district court had jurisdiction pursuant to 21 U.S.C. §841(a)(1) , 21 U.S.C. 846, 21 U.S.C. 952(a), 960(a)(1) and 960(b)(2)(G) and 963.[1]

## COURT OF APPEALS JURISDICTION

The United States Court of Appeals has jurisdiction of this matter pursuant to 18 U.S.C. § 3742(a)(1) & (a)(2), and 28 U.S.C. § 1291 & 28 U.S.C. §1294(1) because this appeal is from  final judgments of a District Court entered on August 20, 2013.[2]

## STATEMENT OF TIMELINESS

Mr. Vasquez's Notice of Appeal was timely filed on August 21, 2013.[3]

## DETENTION STATUS

Mr. Vasquez is presently incarcerated with a projected release date of January 26, 2024.

## STATEMENT OF RELATED CASES

The undersigned counsel for Appellant certifies pursuant to Rule 28-2.6 that she has no information about related cases pending before this court.

---

[1] Superseding Indictment, 9/15/11 ER. Vol.1, p.72; Dkt: 15.
[2] ER Vol. 1, p3. Final Judgment in a Criminal Case, 8/20/13 Dkt. 430
[3] ER Vol.1, p. 1;  Dkt:431

## ISSUES PRESENTED FOR REVIEW

1.     Whether the Government violated Mr. Vasquez's  Constitutional Due Process rights to a fair trial  by unfair sandbagging, decieving the Defense and the trial court that the Government's impeachable key witness would testify?

2.     Whether an uncharged coconspirator's prejudicial hearsay statement was merely idle chatter, was not shown to be in furtherance of the conspiracy, was unreliable, lacked foundation, and was therfore not harmless error and thereby requires a new trial?

3.     Whether Mr. Vasquez received a fair trial and effective assistance of counsel when the government repeatedly failed to provide timely FRCP Rule 16 disclosure and *Brady* materials?

4.     Whether the cumulative effect of the governments unfair tactics and court errors denied Mr. Vasquez a fair trial -- including unfairly prejudicial co-conspirator's hearsay statement;  late *Brady* disclosures;  denying through deception and surprise the defense rights to confrontation and impeachment; vouching; and the trial court's denials of a continuance and failure to enforce Brady?

5.     Whether the court improperly enhanced the sentence under the  U.S.S.G. 3C1.1 when the court made no specific findings of willful and material obstruction or perjury ?

6.     Whether the court improperly enhanced Mr. Vasquez's sentence for a U.S.S.G. 2D1.1 weapons enhancement in lieu of four prior findings that denied the enhancement because the weapon was not relevant in this conspiracy?

7.     Whether the court should  remand to reduce the sentence based on the subsequent retroactive application of  U.S.S.G  2D1.1 and 2D1.11 ?

8.     Whether Mr. Vasquez received effective assistance of counsel where 1) counsel failed to anticipate that the government would not call a crucial key witness and thereby undermined the defense case in opening statements and trial, 2) failed to object to the sentencing weapons enhancement, and 3) failed to object to government vouching?

9     Whether the Government improperly vouched during closing argument requiring a new trial?

## STATEMENT OF THE CASE

On September 15, 2011, Appellant Luis Vasquez, Victor Stuppi, Karla Prieto, Saul Lizarraga-Roldan , Jesus Chavez-Bustamante, and Marcos Sandoval-Lizarraga were charged with conspiracies to possess and import marijuana in violation of 21 U.S.C. 841, 846, 960 and 963.[1]

Mr. Vasquez's case went to trial. The first trial ended in a mistrial on October 15, 2012 due to the 9-3 jury split.[2] The second trial began on February 4, 2013 over strenuous and renewed Defense motions for preclusions or for a continuance due to last-minute voluminous FRCP Rule 16 and *Brady* disclosure.[3]The Defense motions to preclude and/or continue the trial were all denied.

On February 14, 2013, the defendant was found guilty on all counts.[4]

On July 11, 2013, the Government filed an Objection to the Presentence Investigation Report arguing for a perjury enhancement[5] which Probation did not

---

[1] Superseding Indictment, 9/15/11 ER. Vol.1, p.72; Dkt: 15.
[2] ER Vol.1, p. 68; Dkt 190.

[3] Late disclosure includes that another border patrol agent, -Eddie Noriega,- may have also been similarly set up by Stuppi; that Prieto committed perjury in the first trial; that Prieto had prior drug conviction, that Stuppi lied and/or committed perjury the first trial, and that Tiznado denied ever making the coconspirator hearsay statement. See egs., ER Vol. 1, p.59, RT 2/5/13 p.1-9. 217-8
ER Vol.3 Dkts 337 (RT 2/7/13 pp. 4-7;), and pleadings 315, 305, 293, 289, 285.
[4] EOR Vol.1,p.38; Dkts. 367-70
[5] ER Vol. 2, p.42; Dkt. 418

recommend. The Defense filed a Response on July 29, 2013.[1]  Both parties filed

Sentencing Memoranda on August 12, 2013.[2]  The defense failed to object to the

Probation recommendation for a weapon enhancement under 2D1.1, an objection

on which all codefendants previously prevailed.

Mr. Vasquez was sentenced on August 19, 2013 to imprisonment for 151

months and four (4) years of Supervised Release concurrent.[3]  On August 21, 2013,

Mr. Vasquez filed the Notice of Appeal.[4]

## STATEMENT OF RELEVANT FACTS

On the eve of June 17, 2011, Stuppi had contacted Vasquez and told him

he'd be in Agua Prieta, Sonora the following morning and offered to bring

breakfast to Vasquez.  At 7:37 a.m., Vasquez arrived at the Douglas POE for his

shift, wearing his uniform and standard-issued firearm. Vasquez called Stuppi and

informed him of his schedule and lane number, because, as Mr. Vasquez testified,

when family drives through his lane, it requires an inconvenient shift in officers'

stations and to avoid violating policies. [5]

---

[1] ER Vol. 2, p. 24; Dkt. 425

[2] (ER Vol.2, pp. 1 and 17; Dkts 427-USA, 428-Vasquez.

[3] ER Vol.1, p.3; Dkt 430

[4] ER 1, Dkt 431

[5] This summary paragraph is per Vasquez's testimony in both trials. See ER Vol. V. for Jury Trial 1, and ER Vol. 2, p.46 for Jury Trial 2.

Unbeknownst to Vasquez, at 7:42 a.m., Stuppi called Lizarraga-Roldan informing him of lane five from 8:30 a.m. to 9:00 a.m. Lizarraga-Roldan called Chavez-Bustamante and told him to go through lane five. Chavez-Bustamante then successfully drove through lane five and to Prieto's residence. A search warrant was executed resulting in the seizure of 547 kilograms of marijuana from the house and the vehicle.

On July 6, 2011, the Vasquez residence was searched, resulting in no incriminating evidence. Vasquez denied recollection of the events of June 17, 2011. Vasquez was arrested on September 23, 2011. He acknowledged his familial relationship with Stuppi; however, he denied knowing of illegal activity.[1]

For approximately two months before June 17, 2011, the government monitored the phones of Saul Lizarraga-Roldan. Conversations were intercepted on Lizarraga-Roldan's phone lines involving Stuppi, Prieto, and Chavez-Bustamante. These conversations demonstrated Lizarraga-Roldan was a major smuggler for whom Stuppi, Chavez-Bustamante, and Prieto worked and conspired to smuggle marijuana on June 17, 2011. There was no involvement during that period of Juan Tiznado, Prieto's boyfriend, an uncharged alleged coconspirator, who was arrested and imprisoned since January of 2011.[2]

---

[1] Id.
[2] ER. Vol. 3, p. 127; RT 2/5/13, p. 24

Mr. Vasquez did not know or communicate with any of the conspirators

except for with brother-in-law Stuppi and the communication on June 17, 2011

to avoid the family-lane prohibitions.[1]

Mr. Vasquez testified that he was very close to Stuppi and that Stuppi had

everyday information about schedules, ball games, and unrestricted access to the

Vasquez house.[2]

In the first trial, the Defense impeached Stuppi as a liar during cross-

examination[3] as well as by impeachment witnesses: Stuppi's mother, brother and

sister.[4] This defense resulted in a hung jury.[5]

In the second trial, alongside of giving the Defense voluminous late

disclosure on the eve of trial, the Government purposely[6] deceived the Defense

and the trial court that Victor Stuppi would testify again. The Government knew

---

[1] This summary paragraph is per Vasquez's testimony in both trials. See ER Vol.
V. for Jury Trial 1, and ER Vol. 2, p.46 for Jury Trial 2. The Government's case
doesn't have any evidence that contradicts that the only phone contact involving
Vasquez was solely to Stuppi.

[2] Id.

[3] ER Vol. 4, p.118; RT 10/9/12, 10/12/12;  Dkts 253, 248

[4] ER Vol. 3, pp. 208-255;  RT 10/11/12 pp. 132-177 Testimony of Maria Olvirra
Stuppi,  Ociel Castillo, Sanda Huasica

[5] ER Vol.1, p.68; Dkt. 190

[6] See Sentencing of Chavez-Bustamante ER. Vol.3, p.68; RT 3/18/13; Dkt.461;
and Sentencing of  Stuppi.    ER. Vol.3, p.1 RT 5/1/13; Dkt.466., specifically ER
12-23, RT 9-20

that the Defense relied on the impeachment of Stuppi, the key of the

Government case.[1]

On the opening day of the second trial, the Government filed a witness

list including Stuppi[2] and made representations that Stuppi would testify.[3]  In

emails during the preceding weekend, the Government, James Lacey,

represented implicitly that Stuppi would testify. In the same emails, the

Government slipped a sneak preview that Mr. Stuppi might not have been honest

in the first trial, never provided requested *Brady* material and, instead, assured

the defense that the Government would expose it in their direct examination of

Stuppi.[4]  However, they already knew they were not going to call Stuppi.

Had the Defense been truthfully informed, they might have called Stuppi,

filed immunity motions, more rigorously cross-examined other witnesses, more

---

[1] Id.

[2] ER. Vol.1, p.63; Dkt. 306;

[3] ER. Vol.3, pp 129 and 134; Renewed Motion Continue - Email Exhibit, 2/4/13; Dkt.315-1.  See also ER Vol.3, pp. 89; RT 2/7/13, pp. 4-7 Government Again Represents to Court They Will Call Stuppi and Provide Brady. See also ER. Vol. 4, pp. 45-52; RT 2/4/13. pp. 3-8.  Page/word limits preclude illuminating the many instances in which the court relied on the predictable impeachment.

[4] ER. Vol. 3, p. 129, 134, Defense Renewed Motion Continue / Email Exhibit, Dkt. 315

strenuously fought for Brady and sought a continuance to prepare. Certainly, the Defense would not have prejudiced its case in the opening statements. [1]

In both trials, Prieto testified that at some unknown time and date -- she did not even know the year –she was routinely walking over the border with her boyfriend, uncharged alleged co-conspirator Tiznado. She noticed that Tiznado smiled at a border patrol agent. She thought it "weird" and asked him about it. Tiznado said that was "the guy," i.e., implying the agent letting contraband cross. However, Tiznado had been in state custody since at least January of 2011. Prieto had a cooperation agreement. Over defense objections, the coconspirator hearsay was admitted.[2]

At the second trial, Ms. Prieto admitted lying to agents on numerous occasions and perjury in the first trial.[3] She was sentenced to probation despite her criminal history, perjury in first trial, and identical charges as Mr. Vasquez.[4]

Despite strenuous motions and requests for timely disclosure, the Government habitually provided late FRCP Rule 16 and *Brady* Materials,

---

[1] ER Vol.4, p.51; RT 2/5/13, p. 45-65
[2] ER. Vol. 3, pp 93 et seq., 123 et. Seq.; RT 2/6/13, p. 151-180, pp. 144-6.

[3] Id.
[4] ER. Vol.1, p.29; Dkt. 407

including on the Friday before the second trial when the Government dumped disclosure on the defense, including *Brady* material.[1]

At the sentencings of Stuppi, Prieto, Chavez-Bustamante, and Lizarraga-Roldan, the district court made clear findings that the border patrol weapon was not related to or in furtherance of the drug conspiracy.[2]

Probation recommended a 121-month sentence for Vasquez, finding a criminal history score of zero, base offense level 28, four points for the weapon under 2D1.1(b)(1) and Role in the Offense under 3B1.3. Probation did not identify any 3C1.1 perjury basis. The court nevertheless added two points for perjury, increasing the range to 151-188 months,[3] and sentenced Vasquez to 151 months concurrent. The defense did not object nor did the trial court remember that it had already ruled 2D1.1(b)(1) (weapon) to be inapplicable in the overall case. The court stated that it was doubling the sentence it would have otherwise given Mr. Vasquez, from about 6-7 years to over 12 years, because of the alleged perjury.[4]

---

[1] A sampling of this ongoing struggle for disclosure and Brady is in ER Vol.3 Dkts. 71, 169, 289, 305, 315 (the Motions give details of the disclosure abuses) and nevertheless, even after a first trial, the trial court is repeatedly orally ordering the Government to make Brady disclosures about key evidence during the trial: See egs., at RT 1/31/13, RT 2/5/13 p. 218, RT 2/7/13 p.4.

[2] ER Vol.3, pp 1-88; Dkts. 466, 463, 462, 461.
[3] ER Vol.1, p.7; Dkt. 460, RT 8/19/13 pp.5-6
[4] ER Vol.1, p.22; RT 8/19/13 p.6; Dkt. 460.

Since the sentencing in this case, U.S.S.G. 2D.1 and 2D1.11 have retroactively reduced the drug offense level by two points.

## ARGUMENT OF ISSUES PRESENTED

**1. The Government Intentionally Denied Mr. Vasquez Constitutional Rights to a Fair Trial By Deceiving and Sandbagging Both Defense and District Court That The Government's Impeachable Key Witness Would Testify.**

As the error is arguably prosecutorial misconduct, the standard is whether it may have affected the outcome of trial. *US v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987); *US v. Sayakhom*, 186 F.3d 928, 943 (9th Cir. 1999) (citation omitted), amended by 197 F.3d 959 (9th Cir.); *US v. Cabrera*, 201 F.3d 1243 (9th Cir.2000).

In the first trial, the government called Victor Stuppi to testify that Vasquez was involved in Stuppi's conspiracy to allow the movement of marijuana on June 17, 2011 through the Port of Entry in Douglas, AZ. [1]

The Defense case was that Stuppi is a liar defrauding smugglers by fabricating his brother-in-law's complicity and collecting fees, turned cooperator to avoid prison. Stuppi's testimony was impeached and Stuppi's mother testified that Stuppi told her three times that Vasquez was innocent and that he lied to the FBI and Stuppi's brother, Ociel Castillo testified that Stuppi told him on four

---

[1] RT 10/9/12 10/12/12 ; Dkts 253, 248. Cross is at ER Vol. 4, p.118.

occasions that Vasquez was not involved in these charges.[1]  After a mistrial, the Government *secretly* planned to not call him at the second trial.

At the second trial, the Government made explicit representations that Stuppi would testify and then sat silent each time the Defense relied on it;  Defense called witness Stuppi the "face of the Government's case" nine times[2] in opening statements and described the planned impeachment.

As part of the planned deception, the Government sent emails to seemingly bait the Defense indicating that there might be further *Brady* material regarding Stuppi which the Government would expose in its upcoming direct examination of Stuppi.[3]  Specifically, the Government emailed defense on Saturday February 2, 2013 9:38 a.m. stating:

> "I wanted to alert you to the fact that Victor recently discussed some of his trial testimony and mentioned that, on occasion, he misunderstood some of your questions.  That resulted in him giving answers that weren't completely accurate."

Defense counsel emailed, "Will there be a report outlining his testimony where he said he 'misunderstood' the question?"

---

[1] ER Vol. 3, pp. 208-255;  RT 10/11/12 pp. 132-177 Testimony of Maria Olvirra Stuppi,  Ociel Castillo, Sanda Huasica
[2] ER Vol.4, p.51; RT 2/5/13, p. 45-65.
[3] See Dkt 315-1- ER. Vol.3, pp 129 and 134; Renewed Motion Continue - Email Exhibit, 2/4/13; Dkt.315-1.

At 11:01, the Government assured it would question Mr. Stuppi during direct examination:

> "No report was generated on that topic.   With all cooperating defendants, I plan on bring out on direct the times they may have said things that were not accurate, where they may have answered incorrectly on a prior occasion because they misunderstood the question, or where there was flat out false statements.  I don't like to use the word lie.  It just sounds bad."

The Government continued the deception on February 4, 2013.  The government witness list included Stuppi.[1] At critical pretrial *Brady* and continuance arguments before calling the jury, the Government urged the trial court to rely on Stuppi based proffers and allowed the trial court to believe that defense counsel could manage ongoing critical *Brady* problems through the cross-examination of Stuppi.[2]  Also, the prosecutor smugly let the Defense unwittingly destroy itself in opening statements.[3] [4]

During the Government's case in chief, the Court held rulings under advisement based on the Government's false representations and waited for Defense cross-examination of Stuppi to find out more about exculpatory late-disclosed Eddie Noriega.  Noriega was another CBP agent who may have been

---

[1] ER. Vol.1, p.63; Dkt. 306
[2] ER. Vol. 4, pp. 45-52; RT 2/4/13. pp. 3-8.
[3] ER Vol.4, p.51; RT 2/5/13, p. 45-65, Defense Opening Statement
[4] RT 2/4/13 pp. 41, 48, 58, 59, 61, 62, 60-65,

17

similarly set up by Stuppi like Vasquez was.[1]    As trial progressed, the defense and the court continued to rely on Government assurances and/or implications that Stuppi would testify in order to resolve critical *Brady* questions.[2]

The Government rested without calling Stuppi. In closing arguments, the defense counsel was unable to explain his opening statement. For the jury, this probably created suspicion and disrespect for the defense case.

The Government nevertheless admitted incriminating unimpeachable coincidental and circumstantial evidence to the jury through their "phantom witness:" [3] Stuppi's conspiratorial phone conversations with the drug dealer, Lizarraga-Rodan, referring only to a "buddy" or "guy";  coconspirator hearsay through Karla Prieto that her uncharged boyfriend Juan Tiznado, randomly nodded to an agent who was likely the subject of Stuppi-initiated gossip (foundation for source or reliability was never provided), and benign familial conversations with Vasquez, reinterpreted by the Government as conspiratorial.

The unfair gamesmanship designed by the "architect" [4]  responsible for a just trial is evident during the Government's gloating at subsequent sentencings of cooperating co-defendants.

---

[1] ER Vol. 1,p. 59; RT 2/5/13 p.1-9. 217-9

[2] Another example is at ER Vol.3 p.89; RT 2/7/13, pp. 4-7

[3] ER. Vol.3, p.1 RT 5/1/13; Dkt.466, specifically ER 12-23, RT 9-20

[4] *Brady,* 373 U.S. at 87-88, 83 S.Ct. 1194 & n. 2

At the Chavez-Bustamante sentencing, the prosecutor told the court:

> MR. LACEY:
> Ironically enough, Mr. Stuppi, who testified in the first trial, was not called as a witness in the second because we decided to put on more of a circumstantial case and avoid the lengthy cross-examination that came and the defense witnesses that flowed, including Stuppi's mother and brother and a bunch of others.[1]

At Stuppi's sentencing, the Government again gloated about how they

tricked the Defense[2]

MR. LACEY FOR THE GOVERNMENT:
As the Court's aware, he [Stuppi] testified in the first trial, and we opted not to call him in the second for a host of reasons,[3] but he is entitled to and does deserve the 5K1 departure.[4]

The Government planned with Stuppi's attorney before trial to hide it from

Mr. Vasquez's attorney:

MR. LABER (DEFENSE COUNSEL FOR STUPPI)
Now, he didn't testify in the second trial, but he never knew that he was not going to testify. I had some -- I had some belief that he

---

[1] ER Vol. 3, p.68; RT 3/18/13 P. 16.

[2] ER. Vol.3, p.1 RT 5/1/13; Dkt.466. We bring to the Court's attention, furthermore, that both Stuppi and the Government *ex parte* accused Vasquez to be a liar and imposing threats to Stuppi family trial witnesses months before Vasquez's sentencing, none of which was disclosed to the defense. It goes to the otherwise unexplained Vasquez 3C1.1 enhancement argued below. See Vol 3, ER pp 1-27; Dkt. 466; RT 5/1/13 pp., 10-11, 17, and most seriously, the impact these *ex parte* allegations had on the Court's impression of Mr Vasquez, on RT pp. 20-21.

[3] Government avoids Stuppi's perjury in first trial. See ER. Vol.3, p.89; RT 2/7/13, pp. 4-7.

[4] See ft.note 3.

wouldn't be called in the second case, but he was on call, and I never told him that I didn't think he was going to testify. He was ready to be called. It was very important to the Government's case because he was a real witness, but he became a phantom witness, and it caused the defense to put up a phantom defense. It was a smart strategy by the Government, and obviously they prevailed in the case.[1]

MR. LACEY FOR THE GOVERNMENT:

I talked to Mr. Laber about the backdrop of how it played the first time, and we had decided that we weren't going to call him in the second trial unless we were really put up against the wall, and I didn't think we were.

… I said we'd have to be pretty hard pressed to call your client, but I don't want you telling your client that because I don't want word spreading back in the small little world to the defendants to find out what we're doing. And I would note that Mr. Ralls' summation and opening statement all focused on Victor Stuppi. His summation was identical to the second time as it was the first. In the first trial, he talked about the … whole case, the Government's case, is based upon Mr. Stuppi…

… And we strategized the way we did and put on our case the way we did for a lot of reasons, but one of them was Mr. Stuppi helped us immensely by being on the roster and us not letting the word get out that he wouldn't be called until after our case was finished.[2]

This kind of sandbagging in a criminal case cannot be deemed harmless, in lieu of the fact that the jury hung in the first trial. The case so clearly rested on Stuppi's credibility and Vasquez's claim of lack of knowledge that the case turned on this evidence, as the Government and Court obviously knew. In deciding not to give an Allen charge in the first trial, the trial court stated:

---

[1] *Id.*, RT 5/1/13, p. 9  Victor Stuppi Sentencing
[2] *Id.*, RT 5/1/13, pp 18-20-   Victor Stuppi Sentencing.

THE COURT: …let me observe for the record, first, if it is not clear from the transcript. Of course this was a two-week trial, which is probably considered a lengthy trial, but it was anything but complex; it's not a complex case. One could describe it really as a swearing match, a decision a jury has to make as to whether or not they believe the defendant and his testimony or to put it another way whether or not they could believe witness Stuppi to the extent that they would want to hang a guilty finding on his testimony.[1]

Under these circumstances, the defense should not have been purposefully deceived.

The Supreme Court has held:  "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete  defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528 (1984).

Criminal defendants have a constitutional right to present relevant evidence in their own defense. See *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142 (1986). This right comes from both the right to due process under the Fourteenth Amendment (U.S. Const. amend. XIV), see *Chambers v. Mississippi*, 410 U.S.284, 294, 93 S. Ct. 1038 (1973), and the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment (U.S. Const. amend.VI). See *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920  (1967).

---

[1] ER Vol.4, p. 142; RT 10/15/12,  pp.1-3; Dkt 251

As the Supreme Court has long recognized, it is particularly important that the government's case be disclosed to the jury "where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

In *Berger v. United States,* 295 U.S. 78, 88 (1935), the Supreme Court enshrined the special role of the federal prosecutor: It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. In Arizona, pursuant to its role of "minister of justice," " the prosecution has a duty to see that defendants receive a fair trial." Ariz. R. Sup.Ct. 42, E.R. 3.8, comment; *State v. Cornell*, 179 Ariz. 314, 331, 878 P.2d 1352, 1369 (1994); *State v. Rodriguez*, 192 Ariz. 58, 64, 961 P.2d 1006, 1012 (1998).

Full and robust examination should not have been surprisedly curtailed, including by a sandbagging surprise designed by the Government. *US v. Alvarez-Lopez*, 559 F.2d 1155, 1160 (9 Cir. 1977). Further, while the right to cross-examination is not without limit, a full opportunity to develop a witness' pattern of prior illicit conduct is essential to the fair determination of a criminal matter. *US v. Bonanno*, 852 F.2d 434 (9th Cir. 1988).

The touchstone of a prosecutorial misconduct claim is prejudice: the court must consider "the probable effect the prosecutor's [misconduct] would have on the jury's ability to judge the evidence fairly." *US v. Young,* 470 U.S. 1 (1985); *US v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1992).

Had the Defense known the Government would not call Stuppi, the Defense could have restructured its case. The Defense would have litigated for further *Brady* materials rather than trust in the anticipated cross examination of Stuppi to discover it. The Defense could have filed pretrial motions to try to admit evidence originally planned as impeachment evidence. The Defense could have considered whether to call Victor Stuppi. The Defense would have been more aggressive with the examination of other Government witnesses and evidence in an effort to discredit the "phantom" witness, Stuppi. Furthermore, as the 11th hour email from the Government reported, there was "problems" with Stuppi's first testimony but admitting Stuppi "lied" "just looks bad," the Government assured the Defense that the issues would be exposed on direct examination.[1] Thus, Mr. Vasquez was not only denied the opportunity to confront this witness, he was also denied *Brady* material which may have helped him confront other witnesses but didn't, relying on the anticipated Stuppi testimony.

---

[1] ER. Vol. 3, p. 129, 134, Email Exhibit, Dkt. 315-1

The Ninth Circuit has held that *Brady* disclosures are the responsibility of the prosecutor and the failure of defense counsel to discover favorable evidence does not mean that such evidence has not been "suppressed" within the meaning of *Brady*. *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). *Brady* is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely "favorable to the accused," its suppression violates *Brady*. See *Strickler v. Greene*, at 281-82.

In *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763(1972), the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching any government witness, even if the evidence is not inherently exculpatory. No distinction is recognized between evidence that exculpates a defendant and evidence that the defense might have used to impeach the United States' witnesses by showing bias and interest. *US v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375 (1985). Finally, the Supreme Court has clarified that "constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555 (1995)(quoting *US v. Bagley*, 473 U.S. at 682). Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. *Kyles*, 514 U.S. at 435-36.

*Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769 (2009), notes that, although *Brady* may be interpreted to only mandate disclosure of material evidence, the obligation to disclose arises more broadly under a prosecutor's ethical or statutory obligations. See *Kyles*, 514 U.S. at 437, citing ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993).[1]

In this case, the Stuppi sentencing transcript shows how deliberate the prosecutor's plot was, however, whether the misconduct was purposeful or not does not matter. *Smith v. Phillips*, 455 U.S. 209, 219 (1982). As Ninth Circuit Judge Alex Kozinski noted in his now oft-quoted dissent in *US v. Olsen*: "There is an epidemic of prosecutorial misconduct abroad in the land. Only judges can put a stop to it." *US v. Olsen*, 737 F.3d 625 (9th Cir., 2013). "By suppressing this evidence, the prosecution arrogated to itself a central function belonging to the criminal jury and pursued its role as adversary to the exclusion of its role as architect of a just trial," *Brady,* 373 U.S. at 87-88, 83 S.Ct. 1194 & n. 2.

## 2. An Uncharged Coconspirator's Hearsay Statement Allegedly Identifying The Defendant As A Coconspirator And Admitted Over Defense Objections Was Unfairly Prejudicial and Plain Error.

---

[1] See also ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

The admission of FRE Rule 801(d)(2)(E) coconspirator hearsay violated Vasquez's rights under the Confrontation Clause. The Court reviews *de novo* whether an evidentiary error rises to a constitutional violation. *US v. Pineda-Doval*, 614 F.3d 1019, 1032 (9th Cir. 2010); *Crawford v. Washington*, 124 S.Ct. 1354, 541 U.S. 36 (2004). The question of whether a statement constitutes coconspirator hearsay admissible under Fed.R.Evid. 801(d)(2)(E) is a question of law reviewed *de novo*. *US v. Layton*, 855 F.2d 1388, 1398 (9th Cir.1988), cert. denied, 489 U.S. 1046 (1989).

At the first trial, Ms. Prieto, who had been in a romantic domestic relationship with Tiznado testified as follows:[1]

Q.    At some point before Mr. Tiznado was arrested in January 2011, did you come to find out who the person was at the port that had an arrangement with Mr. Tiznado and Mala Cara?

A.    Yes.

Q.    Explain how you found that out.

A.    Juan told me one time that we were crossing back to Agua Prieta. We were walking, and he smiled at the U.S. Customs and he said, like, hi, and I thought it was weird.
We crossed. Then he – I was like so, how do you know him? And he told me that that was the guy, saying that that was the guy that they had an agreement with.

---

[1] Counsel apologizes for inadvertently failing to add Ms. Prieto's first trial direct or cross testimony to the ER, however, the excerpt is copied here verbatim and it may be found at RT 10/5/12 at 12-13, Dkt 178.

On cross examination, Ms. Prieto, however, could not recall the day, month, or even the year when these statements were made.[1]

> Q. Let's talk about that. When did you cross with Juan Tiznado?
> A. It was a long time ago. I do not remember what day it was.
> Q. You don't remember what day it was?
> A. No.
> Q. What month was it?
> A. I did not remember.
> Q. What year was it?
> A. I do not remember.

At the second trial, Karla Prieto again testified that she didn't know when Tiznado made her aware of whom he thought or suspected was a corrupt agent:[2]

> Q: As a result of dating Juan, you said that you knew he was involved in trafficking drugs, did you find out who he was involved with; Juan?
> A. Later on, yes.
> Q. And later on what happened? What year would this be, roughly?
> A. I don't know what year it was that I knew whom he was working with.

Prieto continues with inability to remember when the Government tries to lead her hearsay statement, the most important reason they needed Prieto's testimony. She has no idea before Tiznado's arrest in January 2011 that she and Juan had the idle and brief exchange of words:[3]

> Q: Can you place a time frame as to -- when you had a conversation with Juan when you were walking through the port. Do you know what year that would have been? How long prior to him being arrested

---

[1] RT 10/5/12 at 55-56, Dkt 178.
[2] ER Vol. 3, p.93 et seq.; RT 2/6/13, p. 151-180
[3] I p.104-105.

in '11 was it that the two of you were walking through the port and had some conversation?
A: I don't remember when it was.

Furthermore, the conversation had no context related to the conspiracy; it was idle chatter as evidenced by the record:[1]

Q: After you saw this gesture by Juan, did you continue crossing the port?
A. Yes, we crossed to Mexico.
Q. Did you have any conversation about why he gave this gesture?
A. Yes, I asked Juan who he was, and he said, "that is the guy," and I just left it like that because I knew what he was talking about.

There is no context, no foundation, reliability or source for the statement or information. In fact, barely before the second trial started, it was disclosed that Tiznado denied making the statement.[2] Defense counsel objected frequently to the hearsay statement at the first and second trials.[3] It is further noteworthy that this

---

[1] RT 10/5/12-, Dkt 178
[2] ER Vol. 1, p 59; RT 2/5/13 p.1-9. 217-8. See also ER. Vol. 3, p. 127; RT 2/5/13, p. 24 Government Opening Statement that Tiznado not in this conspiracy.
[3] A spattering of examples include:
ER Vol.1, p 44, Dkt. 345-Motion Suppress Prieto Testimony [300] Denied, 2/11/13. ER Vol.1, p.45; RT 2/11/13 p.91 (denial of Motion to Suppress).
ER Vol.1, p.53; RT 2/7/13 pp. 4-7 (Argument Motion to Suppress).
ER Vol.1, p.59; RT 2/5/13 p.1-9. 217-8 (Argument Motion to Suppress).
ER Vol.1, p. 61; ME 2/5/13: Dkt.338; Motion to [300] under advisement; Defendant's Motion in Limine Brady Material [305] under advisement.
ER Vol.1, p.69; Dkt. 184; ME Deny Motion Strike [168]; Grant Brady [169], 10/9/12.
ER. Vol.1, p.70; ME Deny Preclude, Grant Mot Exclude ID, Dkt. 163.
ER. Vol.3, p.128; RT 2/5/13, p. 42 Government Statement Prieto Perjury
ER. Vol.3, Motion to Compel(Prieto), 10/08/12; Dkt.169.

Tiznado [1] was not a member of the June 17, 2011 conspiracy; Prieto testified that she first started talking with Lizarraga-Roldan after Tiznado was taken into custody in January 2011.[2]

The Government's opening statements confirm this:

> Government: Her boyfriend, Juan Tiznado, was arrested back on January 6th of 2011 with the marijuana seizure that took place back in Douglas. He was out of the fray, out of the conspiracy as far as involvement on June 17 because he was in jail.

Furthermore, Prieto testified to lying to the FBI during the investigation and committing perjury regarding this case on numerous occasions.[3]

The district court took the motion under advisement and then admitted the statement without finding the statement was in furtherance of the conspiracy.[4]

---

[1] ER. Vol. 3, p. 127; RT 2/5/13, p. 24 See also ER Vol. 1, p.59, RT 2/5/13 p.1-9 and 217-8

[2] RT 2/6/13, p 91

[3] ER Vol. 3, p.93 et seq.; RT 2/6/13, p. 151-180; ER. Vol.3, p.128; RT 2/5/13, p. 42

[4] Dkt 300 motion The Court's total reasoning is insufficient on this crucial evidence:

> COURT: "Document 300, which is the defendant's motion to suppress the statement of Prieto, which motion I will deny finding evidence to support the existence of a conspiracy with Prieto, Tiznado -- well, Tiznado makes the statement to Prieto. I find there is sufficient evidence that they are co-conspirators along with the person they allegedly referred to, which is the defendant Vasquez, so I am going to deny that motion." ER. Vol.1, p. 44; RT 2/11/13, p 91; Dkt.346.

A convicted defendant is entitled to a new trial if he can establish that the Government intentionally or inadvertently failed to correct materially false testimony relevant to the credibility of a key Government witness at the trial. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340 (1935). Here, it was disclosed as the second trial was starting that the declarant denied making the statement and Prieto admitted to perjury. With the additional biased motivation of cooperation probation available plea available,[1] the Government insisted on admitting the hearsay.

The government, without any supporting evidence (but for one last-gasp exasperated leading question in the second trial of Prieto about *how it made her feel*[2]) had argued that the statement "was *likely* made to convince Karla Prieto" that "the method of importing marijuana from Mexico into the United States was safe, consistent and reliable and that there was limited risk in joining the

---

[1] ER Under Seal, p.25. Change of Plea Hearing, Karla Prieto, RT 7/30/12

[2] RT 2/6/13, p.107 Direct Exam of Prieto
Q. Did that make you feel more secure knowing that everything was fine?
A. Well, yes.

conspiracy or maintaining membership in the conspiracy."[1]  There is no such

evidence.  Nothing suggested that Ms. Prieto's participation was in jeopardy, that

she required reassurance, or that she was looking for additional information about

the organization.   On the contrary, she randomly asked Tiznado because she

thought his gesture was "weird"[2] and there was no context.  Moreover, when not

being led by the Government, Prieto stated that Tiznado said it because, "He

thought he could trust me," and for no other reason.[3]  Since they were in a romance

at the time; an equally persuasive speculation is that perhaps Tiznado was trying to

impress her.  Mr. Tiznado does not qualify as a coconspirator, nor was the

statement made during the course or in furtherance of the conspiracy.  Tiznado's

"statement was, at best, nothing more than (a) casual admission of culpability to

someone he had individually decided to trust." *US  v. Moore*, 522 F.2d 1068, 1077

(9th Cir. 1975); *U.S. v. Eubanks*, 591 F.2d 513 (C.A.9 (Ariz.), 1979).

Despite the Government's leading question about how it made Prieto feel, in

determining whether a statement is made in furtherance of a conspiracy, the court

looks to the *declarant's* intent in making the statement.  In this case, the declarant

---

[1] Dkt 148 p. 91, Government Response to Def Motion to Preclude that "Juan
Tiznado's statement concerning the method of importing the marijuana (through a
corrupt customs officer) was *likely* made to convince  Karla Prieto that the method
of importing the marijuana from Mexico into the United States was safe, consistent
and reliable and that there was limited risk in joining the  conspiracy or maintaining
membership in the conspiracy. (Emphasis added)."
[2] RT 10/5/12 at 13
[3] RT 10/5/12 at 58

told the Government he didn't even make the statement. In *US v. Williams*, 989 F.2d 1061 (9th Cir. 1993) at 1068, a statement made by codefendant to his live-in girlfriend was an expression of frustration to a confidant, not an attempt to further an objective of the drug conspiracy.

It is important to recognize that Rule 802(d)(2)(E) is designed "to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence. *US v. Layton*, 720 F.2d 548, 556 (9th Cir. 1983) quoting 4 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(2)(E)[01] at 801-235 (1981). Mere "idle chatter" is inadmissible. *US v. Layton*, 720 F.2d 548, 556 (9th Cir.1983). The "in furtherance" requirement is not met by a narrative conversation that amounts to mere "idle chatter." *US v. Paone*, 782 F.2d 386, 390 (2d Cir.1986). "Statements made for personal objectives outside the conspiracy or as part of idle conversation are not admissible under Rule 801(d)(2)(E)." *US v. Moran*, 493 F.3d 1003, 1010 (9th Cir. 2007), *citing*, *US v. Bibbero*, 749 F.2d 581, 584 (9th Cir. 1984). Statements that merely inform someone about one's activities are inadmissible. *US v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979); *US v. Fielding*, 645 F.2d 719, 727 (9th Cir. 1981)(statements that involved a different conspiracy not admissible); *US v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991)(historical statements, with no connection or purpose related to the conspiracy in question, are inadmissible under the coconspirator

statement exception); *US v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) (finding that "[s]tatements made for personal objectives outside the conspiracy or as part of idle conversation are not admissible" under the co-conspirator hearsay exception); *US v. Salgado*, 250 F.3d 438, 449 (6th Cir. 2001) (defining "idle chatter" as conversations which further speaker's own individual objectives rather than objectives of conspiracy); *US v. LiCausi*, 167 F.3d 36, 50 (1st Cir. 1999) (finding defendant's statements were instances of "blowing off steam" and "venting anxiety" and therefore, not in furtherance of conspiracy); *US v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) (noting prejudicial statements not made in furtherance are inadmissible); *US v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986).

In *Urbanik*, two co-conspirators conducted a conversation in furtherance of the conspiracy. Once they finished the business of the conspiracy, they moved to a different part of the house and began lifting weights. During this weight lifting session one of the co-conspirators implicated a third co-conspirator. The Fourth Circuit held that this statement was inadmissible hearsay in that the statement was not in furtherance of the conspiracy; "The requirement is not satisfied by a conversation ... which amounted to no more than idle chatter. *Urbanik*, 801 F.2d at 698."

Mr. Vasquez's right to preclude this evidence is also grounded in the Sixth and Fourteenth Amendments to the United States Constitution. (U.S. Const.

Amend. VI). *Lilly* v. *Virginia,* 527 U. S. 116, 134 (1999) (plurality opinion)

("[A]ccomplices' confessions that inculpate a criminal defendant are not within a

firmly rooted exception to the hearsay rule," Id., 541 U.S. 57. *Crawford v.*

*Washington*, 124 S.Ct. 1354, 541 U.S. 36 (2004). Regardless of hearsay

exceptions, reliability must be considered. The Confrontation Clause provides

that, "the accused shall enjoy the right . . . to be confronted with the witnesses

against him." *Pointer* v. *Texas,* 380 U. S. 400, 406 (1965). As noted above, *US  v.*

*Roberts* says that an unavailable witness's out-of-court statement may be admitted

so long as it has adequate indicia of reliability — *i.e.,* bears "particularized

guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66.   As with other

questions of admissibility, FRE Rule 104 requires a threshold determination of

admissibility before applying Rule 801. FRE. 801(a). Such determinations are left

to the discretion of the trial judge. FRE. 104(a). FRE Rule 602 of the Federal

Rules of Evidence mandates that, "A witness may not testify to a matter unless

evidence is introduced sufficient to support a finding that the witness has personal

knowledge of the matter." No such reliability was presented.

Tiznado's statements failed to meet the *Bourjaily* criteria on several

grounds: (1) statements were not made during the course of the conspiracy

34

identified by the government in the indictment; (2) the statements were idle chatter not made in furtherance of the conspiracy; and (3) the statements lacked any foundation for source or reliability and were unfairly prejudicial.

### 3. Mr. Vasquez Did Not Receive A Fair Trial And Effective Assistance Of Counsel Because The Government Repeatedly Failed To Provide Timely FRCP Rule 16 Disclosure And *Brady* Materials.

As the error is arguably prosecutorial misconduct, the standard is whether it may have affected the outcome of trial in the entire context of the trial. See *US v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987). 'Reversal on this basis is justified only if it appears more probable than not that prosecutorial misconduct materially affected the fairness of the trial.' *US v. Sayakhom*, 186 F.3d 928, 943 (9th Cir. 1999) (citation omitted), amended by 197 F.3d 959 (9th Cir.)." *US v. Cabrera*, 201 F.3d 1243 (9th Cir.2000).

The preceding sections illustrate how the ongoing Late FRCP Rule 16 and Brady disclosure infected defense counsel's readiness for the *second* trial and the pattern of late disclosure in both trials shows a feckless sandbagging practice by the Government in this case.[1]  The Court was lax in enforcing fair disclosure by the

---

[1] As outlined in preceding sections, among countless hearings, orders, and motions for Brady and disclosure in this case and problems for the defense, only a few examples are gleaned by reading Dkts. 148, Dkt 162, Dkt 289, RT 1/31/13 finally appointing second counsel days before trial to help the defense deal with late disclosed thousands of pages; A spattering of examples include:
ER Vol.1, p 44, Dkt. 345-Motion Suppress Prieto Testimony [300] Denied, 2/11/13.  ER Vol.1, p.45; RT 2/11/13 p.91 (denial of Motion to Suppress).

Government despite practices that would have never been allowed for the Defense. The only remedy the Court gave the defense was to finally appoint a second attorney to review newly disclosed thousands of pages during the weekend before the trial. However, the Government shows by its motions that it well understands how important timely disclosure is when it comes to protecting its own case.[1]

A non-exhaustive list of troubling late disclosure practices includes the following:

1. The problems outlined already above concerning late disclosure of Prieto's prior perjury and prior juvenile drug conviction. On September 13, 2012, two weeks before the first trial but over a year since the interview, the Government disclosed a police report detailing an interrogation of Prieto that took place on September 6, 2011 in which Ms. Prieto admitted her involvement in the charged

---

ER Vol.1, p.53; RT 2/7/13 pp. 4-7 (Argument Motion to Suppress).
ER Vol.1, p.59; RT 2/5/13 p.1-9. 217-8 (Argument Motion to Suppress).
ER Vol.1, p. 61; ME 2/5/13: Dkt.338; Motion to [300] under advisement;
Defendant's Motion in Limine Brady Material [305] under advisement.
ER Vol.1, p.69; Dkt. 184; ME Deny Motion Strike [168]; Grant Brady [169], 10/9/12.
ER. Vol.1, p.70; ME Deny Preclude, Grant Mot Exclude ID, Dkt. 163.
ER. Vol.3, p.128; RT 2/5/13, p. 42 Government Statement Prieto Perjury
ER. Vol.3, Motion to Compel(Prieto), 10/08/12; Dkt.169.

[1] See Government Motion to Preclude Witnesses based on late disclosure in the first jury trial Dkt. 145

offense and provided a hearsay comment by her former boyfriend, Tiznado, stating that Vasquez was corrupt agent.[1]

2.      On the eve of the second trial in early February 2013, the Government disclosed that Prieto's prior testimony was false and/ or perjurious and that Tiznado (declarant) denied making the coconspirator hearsay statement.[2]

3.      The problems outlined above by not disclosing that Stuppi would not testify; in fact, the Government went as far as feigning that Stuppi would testify.

4.      In the middle of the second trial the Government used a so-called "drug speak" expert McLaughlin with late notice that he would be a witness and with no prior disclosure of his qualifications.[3]  The 11th hour late, so-called redundant, disclosure also included FBI expert Dawson who did not testify before. The Defense objected and was not ready for the mixture of lay and expert opinion provided in the testimony but didn't have time to prepare effective cross-

---

[1] (Dkt 144 Motion Exclude); See Def. Motion Dkt. 289 filed January 30, 2013 history of the Defense's ongoing and frustrated attempts to receive timely disclosure.

[2] ER Vol. 1, p 59; RT 2/5/13 p.1-9. 217-8; ER. Vol.3, p.128; RT 2/5/13, p. 42

[3] ER Vol. 3, p. 177 et seq., Dkt.289 Defense Motion.  In the first trial, FBI Agent McLaughlin was not disclosed as an expert but was, nonetheless, allowed to testify as an expert witness regarding "drug speak." (RT 10/3/12 at 51, 53-55, 130-134.)The error in this ruling became apparent when, on cross-examination, Agent McLaughlin, himself, admitted that he is *not* an expert in "drug speak." (*Id.* at 96.). The 1/29/13 late disclosure of McLaughlin Dkt. 244 was expanded to include drug speak but provided no qualifications. The Defense objected in Dkt 289 to that as well as the other late expert disclosures.

examination or pretrial motions.  Dual role testimony (expert and lay) requires

clarifying instructions in the Ninth (*US  v. Vera*, 770 F.3d 1232 (9th Cir.

2014)).  Any "small degree of invited error" when the defense failed to submit

its own specific instruction or properly litigate dual role testimony isn't

invited when there isn't time to prepare. [1] *See US  v. Torralba-Mendia*, 2014

WL 1903831 (9th Cir. Apr. 28, 2015).  This is part of the cumulative practice of

late disclosure which cumulatively harmed the defense in this case.

    Between January 29 and January 30, 2013, less than a week before the

second trial and despite the documented ongoing struggle to receive timely

disclosure in order to adequately defend the case and ensure a fair trial,[2] the

Government disclosed numerous expert witnesses.[3] The filings in both trials show

---

[1] See RT 2/12/13 p 215; RT 2/13/13 p. 132.

[2] See the full extent of Dkt 289 Defense Motion Regarding Government Witnesses,
filed January 30, 2013, which was filed before the Defense found out about
Tiznado denying the coconspirator hearsay statement admitted through Prieto,
before the Defense was informed that Prieto committed perjury at the first trial,
and before the Defense was apprised over the weekend before trial that Stuppi
made some "misstatements" in the first trial."

[3] Dkt 277 (Disclosure of Juan Rivera, Alberto Macias, Robert Arvisu and Jerald
Glaser, each of whom are officers with U.S. Customs and Border Protection
(CBP), as expert witnesses at trial and who did not testify at the first trial), 278 (
James McLaughlin, Special Agent, Federal Bureau of Investigation, as an expert
witness who did testify at the first trial), 283 ( Kelly T. Goldsmith, Forensic
Accountant, Federal Bureau of Investigation, as an expert certified fraud examiner
and who testified at the first trial, but introduced at the second trial a newly
disclosed contested "summary chart at trial- see also RT 3/31/13 p. 11 pretrial
arguments) , and 288 ( Special Agent with the United States Department of Justice,

the struggle Defense had obtaining timely disclosure.  In the January 31, 2013

pretrial conference for a Tuesday February 4 trial date, the trial court finally

granted a second attorney to the defense due to thousands of pages being dumped

on the Defense in January 16, 2013. The history of Defense motions to compel,

disclose, or preclude and the attachments reveal an unethical practice of late

Government disclosure, especially for the extension of time that entailed a second

trial.[1]

      4.      Consistent with prejudicial gamesmanship throughout, on January 16,

2013,  approximately two weeks before the second trial, the Government dumped

thousands of pages of late FRCP 16 and *Brady* materials, arguing disingenuously[2]

that it was merely redundant and renumbered materials. However, that and other

materials disclosed days before trial included information about Eddie Noriega, a

CBP agent who stated he was also unwittingly misrepresented as corrupt by Stuppi

to drug smugglers, the months-old presentence reports of cooperating testifying

codefendants, information that Tiznado denied making the coconspirator hearsay

---

Drug Enforcement Administration (DEA), as an expert witness at trial, who did not
testify at the first trial).

[1] Most specifically right before second trial, see ER Vol. 3 pp. 129-210; Defense
Dkt. 315; RT 1/31/13; Dkt 285; Dkt 289; 289-1  at   ER p. 206, and Government
Notices of Expert Witnesses: at Dkts. 288, 283, 278, 277, 262.  Dkt 71 shows that
Motions to Compel were being granted during the first trial and still not being
honored.
[2] 1/30/13 Dkt 285)

statements which had already been strenuously opposed in the first and second trials, and information that Prieto's lied to agents and committed perjury in the first trial.

The United States Constitution imposes upon the United States an obligation to disclose certain evidence to a criminal defendant.[1] Rule 16 of the Federal Rules of Criminal Procedure is another source that imposes such a duty on the United States. If a party fails to comply with Rule 16, the court may: (1) order the violating party to permit the discovery or inspection; specify its time place, and manner; and prescribe other just terms and conditions; (2) grant a continuance; (3) prohibit the violating party from introducing the undisclosed evidence; or (4) enter any other order that is just under the circumstances. *See* FED. R. CRIM. P. 16(d)(2)(A)-(D).

A continuance is clearly the least intrusive remedy to a discovery violation, allowing for review of undiscovered information and further investigation. *See US v. Olson*, 697 F.2d 273, 275 (8th Cir. 1983); *US v. Peveto*, 881 F.2d 844, 863 (10th Cir. 1989) (granting continuance as a result of government's discovery violation as there was no bad faith). Despite so many ongoing failures of the Government to timely disclose crucial evidence to the Defense up to the eve of

---

[1] See U.S. Const. amend. V.

trial, the Court denied two compelling motions to continue.[1] The Court thereby erred and prejudicially limited the Defense preparedness, representation and effectiveness.

All of the above Brady discussion and case law in preceding sections also applies to this section. *Brady* v. *Maryland*, 373 U.S. 83 (1963).

Because the district court wrongly allowed the trial to go forward immediately despite two strenuous defense motions to continue,[2] Defense never got the opportunity to investigate the issues regarding Noriega and other witnesses, and was deceived by the Government that Victor Stuppi's newly disclosed problems with prior testimony would be brought forth in the Government's direct examination.

The Government's tactics and the district court errors violate due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. See *Brady*, 373 U.S. 83, 87 (1963); *US v. Barton*, 995 F.2d 931, 933-34 (9th Cir. 1993). By withholding the materials while making factual representations inconsistent with it in order to avoid a continuance, the government violated due process by "depriving [appellants ] of liberty through a deliberate deception of court and jury . .. [which is] as

---

[1] ER p. 162, Dkt. 285 (1/30/13) and ER 129, 134, Dkt. 315 (2/4/13).
[2] RT 1/31/13 and 2/4/13.

inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. " *Brady*, 373 U.S. at 86. Under these circumstances, the government's actions have affected the outcome of the trial, and appellants' due process rights were not adequately protected. See *US v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993). Unlike the defendant in *Woodley*, however, Mr. Vasquez did not receive the Brady material timely enough to investigate it or present it at trial effectively, especially the information about Eddie Noriega, the denials of Tiznado, and the never fully disclosed information in the aforementioned late email about Stuppi's problematic testimony in the first trial.

### 4. The Cumulative Effect Of the Governments Unfair Tactics and Trial Court's errors denied the Appellant Constitutional Rights to Due Process and a Fair Trial.

Prejudice is cumulative. In this case the Government exercised control over many witnesses the defense wanted to investigate, cross examine, interview, or call in the their case in chief.[1] The Government controlled witnesses from all of the border agents whether antagonistic or partial to the Defense, to Stuppi (who they hid from the Defense as a "phantom" unimpeachable witness), Tiznado (who they interviewed a week before trial and who. despite saying he did not make the critical ID hearsay statement, was threatened with prosecution), and Prieto and

---

[1] See ER Vol. 3, p.136; RT 1/31/13 pp 4-9 – for example.

Chavez-Bustamante (who were promised lenient, possible probation, sentence).[1]
Along with the Rule 16 and *Brady* complaints in the preceding section, the
Government controlled the Defense's right to have witnesses testify by requiring
stipulations to certain evidence in exchange for access to and testimony of law
enforcement witnesses.[2] Furthermore, the Defense had problems with access and
control of potentially exculpatory witness Juan Tiznado due to a lack of parity
concerning granting of immunity.

    Other more detailed sections in this brief explain the prejudices suffered by
the deception that Stuppi would testify as a Government witness and the error
committed by admitting Prieto's highly unreliable challenged co-conspirator
hearsay statement.

    We request that in considering the cumulative effect of these prejudices, that
the Court allow the incorporation of another section below which outlines the
prejudice suffered due to the improper vouching by the Government at closing
arguments in trial that rested on a battle of credibility between Vasquez and it's

---

[1] Def motion re Government wits Dkt 289. See pp 6 of 1/31/13 pretrial conference
motion in limine re government witnesses. Defense motion for *Brady* 305 under
advisement 2/5/13 ME Dkt 338. Def motions for continuance because of deluge of
late critical disclosure, late *Brady* despite so many requests see Dkts 315 and 285.
[2] See Government trial brief that defense had to stipulate to certain evidence in
exchange for his constitutional right to have witnesses testify in his behalf. Dkt
282, page 3, ftnote 1.

"phantom" witness, Stuppi, and dubious coconspirator hearsay admitted through the admitted liar and perjurious Prieto.

We also ask the Court to add to its consideration of this section on cumulative prejudicial patterns by the Government, the *ex parte* incrimination of Mr. Vasquez discussed further below which occurred at the Stuppi sentencing and probably caused Mr. Vasquez an otherwise unexplained 3C1.1 sentencing enhancement.[1]

## 5. IMPROPER GOVERNMENT VOUCHING DURING CLOSING ARGUMENT REQUIRES A NEW TRIAL.

The standard of review for improper prosecutorial vouching is plain error. <u>US v. Smith</u>, 962 F.2d 923, 933-34 (9th Cir.1992).

In closing arguments, the Defense pointed out that Karla Prieto had committed perjury in the first trial and that the Government and Prieto admitted to that. The Defense pointed out that regardless of the first perjury, the Government still wanted her testimony and did not pull her plea offer. The Defense did not say that the Government told or counseled her to lie in the second trial, however, only that Prieto is a known liar and can't be trusted. [2]

---

[1] See Vol 3, ER pp 1-27; Dkt. 466; RT 5/1/13 pp., 10-11, 17, and most seriously, the impact these *ex parte* allegations had on the Court's impression of Mr Vasquez, on RT pp. 20-21.

[2] ER. Vol. 4, p. 71 et. seq.; RT 2/13/13, p.55 et. seq. Defense Closing Argument

In rebuttal closing arguments, however, the Government threw its own entity, personal weight and credibility by arguing:[1]

> He suggested to you and to everybody in this courtroom that the government suborned perjury.
> That is a federal crime.
> We can go to jail for that if we were to suborn perjury.
> That is what he was telling you, and if you think that for one millisecond, do what you have to do.

In *US  v. Smith*, 962 F.2d 923, 933-34 (9th Cir.1992), the prosecutor assured the jury in closing argument that his job was to turn over favorable evidence to the defense and to lead them to the truth, and that "[i]f I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen." Defense counsel had attacked a witness's credibility, and the prosecutor told the jury the witness could not just say anything he wanted to because he would be prosecuted for perjury. The witness's testimony was crucial, the prosecutor's comments as a whole were not invited, and the prosecutor placed the prestige of both law enforcement and the court behind the witness's testimony. The Ninth Circuit reversed for clear error. *Id.* at 934-36.

---

[1] ER. Vol. 4, p. 100-102; RT  2/13/13,  p.85, 92, Excerpt of Government Closing Argument.   See also pp 86 and 87 where Government doesn't dispel his p.85 vouching but rather bolsters his witnesses credibility by discussing his personal meeting with Prieto and how she admitted she "lied" in prior relevant testimonies (what most other people perjury) and how the Government asserts her current testimony is true, however, because Lacey told her all the punishing things the Government would do if she lied again.

In light of the fact that Prieto's testimony was impeached, the nature of the vouching did appreciably put the integrity of the prosecution behind her credibility, i.e., that if the jury did not believe her that the prosecutor would be prosecuted for suborning perjury, therefore the prosecutor would never take such a grave risk.

Impermissible vouching occurs when the prosecutor places "the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggests that information not presented to the jury supports the witness's testimony." *US v. Jackson*, 84 F.3d 1154, 1158 (9th Cir.1996) (citation and internal quotation marks omitted). Closing arguments or rebuttal constitute vouching if the prosecutor gives any personal assurance of the truth, or imply that he could determine whether the witnesses lied. *Jackson*, 84 F.3d at 1158.

Defense counsel did not object. However, although counsel bears responsibility to object when necessary, "even in the absence of objections . . . , a trial judge should be alert to deviations from proper argument and take prompt corrective action as appropriate." *US v. Sanchez*, 659 F.3d 1252, 1258 (9th Cir. 2011). This would be especially applicable in a trial concerning admitted liars, such as the Government's roster in this case. This would be still more imperative where the trial court witnessed the kind of Government designed deception that caused the Defense to eviscerate its credibility in opening statements due to reliance on the Government's false representations that Stuppi would testify again.

46

Such judicial corrective action "may neutralize the damage by admonition to counsel or by appropriate curative instructions to the jury." *US v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990). When counsel makes an improper argument, the court should admonish counsel and/or give the jury an appropriate curative instruction. *US v. Rudberg*, 122 F.3d 1199 (9th Cir. 1997); *US v. Hoskins*, 446 F.2d 564, 565 (9th Cir. 1971).

This vouching was the typical prejudicial vouching; it was also telling the jury that the prosecutor would be prosecuted, a terrible psychological pressure to put on the jury, a kind of emotional blackmail. Prosecutorial misconduct invites reversal if it appears more probable than not that alleged misconduct affected a jury's verdict. *U.S. v. Simtob*, 901 F.2d 799, at 806 (C.A.9 (Mont.), 1990). The prosecution may not, as happened here, portray itself as a guarantor (or as in this case, a martyr) of truthfulness. *US v. Roberts*, 618 F.2d 530, at 537, (9th Cir.1980), cert. denied, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981); *Simtob*.

**6. The Court Improperly Enhanced Mr. Vasquez's Sentence Under The U.S.S.G. 3C1.1 Obstruction Of Justice Guidelines When The Court Made No Required Findings Of Willful And Material Instances Of Perjury.**

Mr. Vasquez appeals the district court's imposition of a two-level enhancement for Obstruction of Justice under U.S. Sentencing Guidelines Manual

(U.S.S.G.) § 3C1.1.[1]  The district court's characterization of a defendant's conduct as obstruction of justice within the meaning of §3C1.1 is reviewed *de novo. US v. Cordova Barajas*, 360 F.3d 1037, 1043 (9th Cir. 2004), *US v. Castro-Ponce* (No. 13-10377 - 9th Cir., 2014). Mr. Vasquez objected to the perjury enhancement in their Response to the Government's Objections to the Presentence Report.[2]  At the sentencing, counsel was prohibited from further discussion about it with the trial court warning him, "I've considered your opposition, Mr. Ralls. I don't think it would serve in my decision to hear anything further from you in that regard. I think if you argued that issue, to me at least, you'd just make it worse." [3]

At the time, the Defense did not know that the trial court had been prejudicially incriminated *ex parte* at the Stuppi Sentencing as discussed further below.[4]

---

[1] ER Vol. 1, p. 7, RT 8/19/13; Dkts. 430 and 460.  ER Under Seal SOR.

[2] See ER Vol. 3, pp 1-42, Defendant's Sentencing Memorandum, 8/12/13, Dkt. 428; Government Sentencing Memorandum , Dkt. 427; Response to Government Objection to PSR, 7/29/13 , Dkt. 425; Government Objection to PSR, 7/11/13 Dkt. 418; RT 8/19/13 p.6 -- Defense was not allowed to argue it any further: Court: "I've considered your opposition, Mr. Ralls. I don't think it would serve in my decision to hear anything further from you in that regard. I think if you argued that issue, to me at least, you'd just make it worse."  Defense did not know that the trial court had been prejudicially incriminated at the Stuppi Sentencing as discussed below.

[3] ER Vol. 1, p.12; RT 8/19/13, p.6.

[4] See Vol 3, ER pp 1-27; Dkt. 466; RT 5/1/13 pp., 10-11, 17, and most seriously, the impact these *ex parte* allegations had on the Court's impression of Mr Vasquez, on RT pp. 20-21.

In its refusal to consider 18 USC §3553 factors and uncritically adopting the Guidelines outlined in the Presentence Report, the district court committed plain error. *US v. Castillo–Marin*, 684 F.3d 914 (9th Cir., 2012). The district court imposed a sentence far greater than necessary than what is required under that statute.

While the Court made no specific findings that Mr. Vasquez committed perjury as discussed below, Mr. Vasquez may have unknowingly been prejudiced by highly damning *ex parte* allegations made to the trial court at the sentencing of Victor Stuppi, which is the only place in the entire record with any remotely specific allegation of attempted obstruction of justice. The trial court should not have engaged in the prejudicial discussion and *ex parte* representations about Mr. Vasquez being a liar and threatening witnesses.[1] Mr. Vasquez should have been informed about what was said about him and given an opportunity to defend himself before his sentencing hearing. No disclosure about this was ever made to Defense by the Government or the trial court, though the record shows that the trial court took it very seriously. That hearing may have prejudiced the trial court about Mr. Vasquez's testimony, causing the court to later vaguely claim that he committed perjury two times, i.e., by claiming overall innocence at two trials. Rather than specific instances of lying or obstruction of justice, the court found

---

[1] See ER VIII, pp 13-25, RT 5/1/13, pp. 10-23.

that all elements of his testimony at two trials was perjurious,[1] turning the Guideline and its protections against this kind of reasoning on its head.

The enhancement under § 3C1.1 is far from automatic—when contested, the elements of perjury must be found by the district court with specificity. *US v. Dunnigan*, 507 U.S. 87, 113 S. Ct. 1111 (1993). In *Dunnigan*, the Supreme Court held that, "upon a proper determination that the accused has committed perjury at trial," the accused's trial testimony can supply the basis for application of the U.S.S.G. *§ 3C1.1* enhancement. To decide when an accused's testimony constitutes perjury, *Dunnigan* adopted the federal criminal definition of perjury set out in *18 U.S.C. § 1621*. *Dunnigan, 507 U.S. at 94*. Under that definition, "[a] witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id.* (citing *18 U.S.C. § 1621(1)*). If defendant objects to sentence enhancement resulting from allegedly perjurious trial testimony, as was done here, the district court must review evidence and make independent findings necessary to establish willful impediment to or obstruction of justice, or attempt to do same; in so doing, it is preferable for district court to address each element of alleged perjury in separate and clear finding. *Dunnigan.*

---

[1] Id., RT pp. 5-6.

To enhance a sentence based on obstruction of justice, a district court must make explicit findings that not only did the defendant give false testimony, but also that the falsehoods were willful and material to the criminal charges. A more forgiving standard, would have the unintended consequence of chilling a criminal defendant's willingness to take the stand and give testimony in his or her defense. To require explicit findings on elements needed for the obstruction of justice enhancement helps ensure reliability and reviewability of a sentencing decision. *US v. Castro-Ponce*, 770 F.3d 819, 823 (9th Cir. Ariz. 2014).

As in *Castro-Ponce*, the district court in this case was required to identify specific material matters that showed Vasquez committed perjury, rather than merely because he testified. Mr. Vasquez's first trial of credibility resulted in a hung jury.

During the Vasquez sentencing, the court actually stated that it was doubling Mr. Vasquez' sentence because of perjury without any *express* finding of materiality or specificity.[1] The sentencing enhancement was incorrectly applied and must be vacated. *Id*.

In *US v. Jimenez-Ortega*, 472 F.3d 1102 (9th Cir. 2007), the Ninth Circuit confronted a case in which the district court had characterized the defendant's testimony as "so incredible, in light of all of the evidence, that it was clear to the

---

[1] ER Vol.1, p.22; RT 8/19/13 p.6; Dkt. 460.

51

court that [he] intended to obstruct or impede justice with [his] version of the facts. [His] testimony was not the result of any confusion, mistake, or faulty memory, but an attempt to willfully obstruct justice." *Id.* at 1103. But because there was no finding on the issue of materiality, the Ninth Circuit vacated the enhancement. *Id.* at 1104. *See also US v. Massey*, 48 F.3d 1560, 1573-74 (10th Cir. 1995) (reversing obstruction enhancement where district court had found that defendant's testimony was false, but did not identify the false testimony or make specific findings as to materiality and willfulness). We have even less findings or record here.

Then the Court sentenced Mr. Vasquez, a first-time, non-violent offender to 151 months, with the following explicit reasoning:

> THE COURT: Well, Mr. Vasquez, based on this quantity -- just purely on the quantity of marijuana and if you'd have gone to trial -- which was your constitutional right to do so -- and you had not perjured yourself at that trial, you'd be looking at, like, six to six and a half years just based purely on the quantity of the drug and the purity, if you will, of the sentencing guidelines and how they calculate those.[1]

That increase is so severe that it invokes the law in *US v. Booker*, <u>543 U.S. 220</u> (2005). *Booker* ruled that the Sixth Amendment right to jury trial requires that, other than a prior conviction, only facts admitted by a defendant or proved beyond a reasonable doubt to a jury may be used to calculate a sentence, whether the

---

[1] ER Vol.1, pp. 19; RT 8/9/13 pp. 12-13.

defendant has pleaded guilty or been convicted at trial. The maximum sentence a judge may impose is a sentence based upon the facts admitted by the defendant or proved to a jury beyond a reasonable doubt. The district court violated Mr. Vasquez's constitutional rights, as articulated in *Blakely v. Washington*, 542 U.S. 296, (2004), when it enhanced his sentence pursuant to USSG § 3C1.1 because the enhancement was not based upon findings made by jury or factual admissions made by defendant; the district court erred when it enhanced a defendant's sentence based upon its own findings that defendant had obstructed justice. See also *U.S. v. Rising Sun*, 522 F.3d 989 (9th Cir., 2008).

The arbitrariness and over breadth of this enhancement and its underlying base in the obstruction statutes has been recently analyzed and rejected by the Ninth Circuit in *US v. Bonds*, 11-10669, April 22, 2015. The facts of this case should be analyzed in light of the Bonds case. In this case, two codefendants who admitted committing perjury against Mr. Vasquez in the first trial[1] were given sentences of probation for their cooperation with no mention of a 3C1.1 enhancement. Then the Court turned its attention to Mr. Vasquez, and with no specific findings or admissions of a material or willful false statement, severely

---

[1] ER Vol. 3, p. 89; RT 2/7/13, pp. 4-7. ER. Vol. 3, p. 93; RT 2/6/13, p. 151-180. ER. Vol. 3, p. 123; RT 2/6/13, p.144-146 ; ER. Vol. 3, p. 125; RT 2/5/13, p. 218. ER. Vol. 3, p. 128, RT 2/5/13, p. 42.

enhanced his sentence for testifying as to his lack of knowledge about the

conspiracy.

### 7. The Court Improperly Enhanced Mr. Vasquez's Sentence for U.S.S.G. 2D1.1(b)(1) Weapons Enhancement.

Defendant Vasquez did not object to this enhancement, thus plain error

review is warranted under *US v. Ameline*, 409 F.3d 1073, 1078 (9th Cir 2005).

However, the trial court did explicitly consider this enhancement under the facts of

this case in the sentencing proceedings of every codefendant, all of whom raised

the objection, and explicitly found that the CBP duty gun issued to Mr. Vasquez

was not for purposes of or relevant to the drug conspiracy.

In the sentencing of Jesus Antonio Chavez-Bustamante Sentencing:[1]

> THE COURT: Well, government, I don't see it. I mean, clearly there's a gun in the chain here, but it's got nothing whatsoever to do with this offense. I mean, there was no reliance on the guard being armed. Quite the contrary. They felt safe that they had a guy on the payroll that would pass them. I mean, I don't see how a gun's got anything to do with this, increasing the risk at all.
> I may be wrong. I mean, there's a -- just a gun. I have enhanced before where a gun has been present, certainly wasn't used. Firearm was present and -- but it had some potential for use in the transaction.
> I mean, what are these conspirators supposed to think, that they've got this Customs agent who is armed that if somebody pulls them into secondary like they should have in this case, that the Customs agent is going to start shooting people? I just can't see it.

In the sentencing of Saul Lizarraga-Roldan (Mala Cara):[1]

---

[1] ER. Vol. 3, p. 68; RT 3/18/13.P.3, Dkt. 461

THE COURT: Now, the objection was the plus two levels for the weapon. And I better be consistently wrong about that, if I am, and I've sustained that objection for other defendants in this case.

I just don't think it's -- well, I think it's clearly improbable that the gun was related to this offense; and therefore, I am going to sustain the objection.

I'll find the guidelines, then, at a Level 28.

In the sentencing of Karla Prieto:[2]

THE COURT: The government doesn't like this, and they disagree, but I have found for the other defendants that it was clearly improbable that that firearm would be used in this transaction.

In the sentencing of Victor Stuppi:[3]

THE COURT: The objection was plus two for the gun that was possessed by Vasquez, and for the other defendants, I have sustained such an objection over the Government's opposition. The Government takes the position that there should be a plus two, but I've found as to the other defendants, and therefore I need to find as to Mr. Stuppi, that it was, what's the language, not -- it was clearly --

MR. LACEY: Unforeseeable.

THE COURT: No. What's the language? Clearly improbable that it was --

MR. LABER: It was to be used during the course of --

THE COURT: Yeah. That's my finding.

MR. LABER: -- the course of the conspiracy.

THE COURT: That's my finding, and I clearly understand why probation makes that assessment, but --

…

THE COURT: But I'm going to sustain the objection in this case as well…

---

[1] ER. Vol. 3, p. 50; RT 3/21/13 P.3; Dkt. 462
[2] ER. Vol. 3, p. 27; RT 4/29/13 p. 3; Dkt. 463
[3] ER. Vol. 3, p.1; RT 5/1/13 pp. 2-4; Dkt. 466

USSG § 2D1.1(b)(1) Comment 3 states in pertinent part: The enhancement should be applied if the weapon was present, <u>unless it is clearly</u> <u>improbable that</u> <u>the weapon was connected with the offense</u> (emphasis added), as was the repeated finding of the trial court.

Judge Bury correctly observed in the cases of all four co-defendants that co-defendant Vasquez had an unrelated duty pistol which he was required to have because of his job, that it was not connected with the offense, and was not present or used for any purpose related to this conspiracy. See *Smith v. United States*, 508 U.S. 223 (1993) "the firearm must have some purpose or effect with respect to the . . .crime; its presence or involvement cannot be the result of accident or coincidence." *Id.* at 238. *US v. Routon*, 25 F.3d 815 (9th Cir. 1994).

The trial court and defense counsel seem to have simply forgotten to discuss and discount the enhancement. Regardless of whether the Vasquez defense objected, the sentence based on this enhancement requires a remand.

### 8. The Court Should Remand To Reduce The Sentence Based On The Retroactive Application Of U.S.S.G. 2D1.1 and 2D1.11.

Whether or not Mr. Vasquez's other sentencing issues qualify for remand, we request the district court on remand to consider reducing the sentence based on the retroactive application of U.S.S.G § 2D1.1 and U.S.S.G §2D1.11. These changes generate a 2-level retroactive reduction in all offense levels found in §2D1.1 and §2D1.11 of the Guidelines, effective November 1, 2014. After November 1, 2014,

judges may begin to consider petitions for relief. However, any order granting relief will not go into effect until November 1, 2015.[1] Mr. Vasquez qualifies for this reduction retroactively.   See *US  v. Wales*, 977 F.2d 1323, 1327-28 (9th Cir. 1992).

Mr. Vasquez is eligible for a reduction in his Guidelines offense level because he was convicted of drug crimes pertaining to 21 U.S.C. § 841(a)(1) and (b)(1)(D).[2]  The probation officer and the district court used the base offense level set by Guidelines §2D1.1 as the starting point for calculating Mr. Vasquez's sentence.[3]

Pursuant to the new Guideline range, Mr. Vasquez's  base offense level will be 26, rather than 28.  In light of Mr. Vasquez's criminal history category of I, the two-level reduction yields a 15-24 month range sentence reduction.[4] Regardless of Mr. Vasquez's challenges to two of the three enhancements added by the court to his base offense level, the new Guidelines range will be significantly lower. It is likely that the district court would lower Mr. Vasquez's

---

[1]The retroactivity specifies that a  district court shall not order a reduced term of imprisonment based on the Guideline Amendment unless the effective date of the court's order is November 1, 2015, or later. App. B p. 5. Because Mr. Vasquez's projected release date is January 26, 2014, this limitation will not prevent the Guideline from having a concrete effect upon Mr. Vasquez's sentence.

[2] Dkt. 430, 8/20/13.
[3] Under Seal Presentence Report
[4] U.S. Sentencing Guidelines Manual Ch. 5 Pt. A (2012 or 2014).

sentence based on the retroactivity of the Guidelines amendment and policy logic of the reduction.

The ordinary mechanism for individuals serving sentences to seek relief pursuant to retroactive Guidelines amendments is a motion filed pursuant to 18 U.S.C. § 3582(c)(2). App. B pp. 3-4. But the opinion in *US v. Wales*, 977 F.2d 1323 (9th Cir. 1992), demonstrates that the relief requested herein is appropriate under the circumstances.

In *Wales*, the Court reviewed an appellant's sentence for willfully making a false statement on a customs declaration in violation of 18 U.S.C. § 1001. *Wales*, 977 F.2d at 1324-25. The Court acknowledged that "[o]rdinarily a defendant must petition the district court for modification of his sentence under [Guidelines] section 1B1.10." *Id*. at 1328 n.3 (*citing* 18 U.S.C.§ 3582(c)(2)). But "[b]ecause [the appellant] raised the sentencing issue on appeal, [the Court] s[aw] no need to force him to take this additional step." *Id*. (*citing US v. Connell*, 960 F.2d 191, 197 n.10 (1st Cir. 1992)). Accordingly, the Court remanded the case to the district court so that the district court could determine whether to adjust the appellant's sentence in light of the Guidelines amendment. *Id*. at 1328.

Here, as in *Wales*, there is no need for the Court to force Mr. Vasquez to take the "additional step" of filing a petition under 18 U.S.C. § 3582(c)(2) to take

advantage of these approved Guidelines amendments. *Wales*, 977 F.2d at 1328 n.3.

Mr. Vasquez thus respectfully requests that regardless of how the Court resolves the issues raised herein, the Court should remand the case with instructions that the district court consider a reduction in light of retroactively applied U.S.S.G § 2D1.1 and U.S.S.G §2D1.11.

To be clear: Mr. Vasquez is not requesting that the Court remand the case without addressing all issues raised throughout – instead he is asking that the Court first address the issues that he raises, and then ensure that its disposition of the appeal includes a remand with instructions that the district court reconsider Mr. Vasquez's sentence in light of retroactively applied U.S.S.G § 2D1.1 and U.S.S.G §2D1.11.

### 9. Defendant Vasquez Did Not Receive Effective Assistance Of Counsel Where 1) Counsel Failed To Anticipate That The Government Would Not Call A Crucial Key Witness, 2) Failed To Object To The Sentencing Weapons Enhancement, And 3) Failed To Object To Government Vouching.

Ordinarily, a plea of ineffective assistance of counsel should be brought in a collateral proceeding under 28 U.S.C. § 2255 because the appellate record often lacks a sufficient evidentiary basis as to "what counsel did, why it was done, and what, if any, prejudice resulted." *US v. Molina*, 934 F.2d 1440, 1446 (9th Cir.1991). Nevertheless, where the record adequately sets forth the facts giving rise

to a claim of ineffective assistance of counsel, the Ninth Circuit will consider the defendant's argument on direct appeal. *Id.* When it so decides, it reviews counsel's effectiveness de novo. *US v. Birtle*, 792 F.2d 846 (9th Cir.1986).

The Sixth Amendment to the Constitution provides that criminal defendants "shall enjoy the right to have the assistance of counsel for his defense." U.S. Const. Amend. VI. Counsel's effectiveness is analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to *Strickland*, there are two components to an effectiveness inquiry, and the petitioner bears the burden of establishing both. *Id.*; *US v. Olson*, 925 F.2d 1170, 1173 (9th Cir.1991). First, the representation must fall "below an objective standard of reasonableness." 466 U.S. at 687-88, 104 S.Ct. at 2064. If the petitioner satisfies the first prong, he must then establish that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, i.e., whether or not "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 368, 113 S.Ct. 838, 842, (1993).

Examples of counsel's failings in the instant case include:

First, an unnecessary two points were added to the base offense level, undoubtedly because defense counsel did not file a sentencing memorandum objecting to the weapons enhancement under 2D1.1 nor did he raise it at the sentencing hearing. All defense counsel had to do was minimally object to trigger the trial court's memory that it had already ruled in all four codefendant's sentencings that the CBP issued gun irrelevant to the charges and wanted to be consistent in that ruling.[1] That record was also available to defense counsel as those sentencings occurred before Vasquez's.

Second, by relying on Government representations that Stuppi would testify defense counsel did not more vehemently pursue the *Brady* materials related to Stuppi, Eddie Noriega, and other evidence as described in preceding sections, did not force the Government to disclose witnesses in an early pretrial hearing, and undermined the defense's integrity and credibility in opening statements when telling the jury they would critically impeach a key government witness described as the "face of the Government's case," nine times.[2] The details of promised defense witnesses and evidence that never appeared had to have impugned the defense case immeasurably. This is not effective trial strategy even if the prosecutor had no hand in a misunderstanding or misconduct.

---

[1] See Section on Weapons Enhancement and transcripts of all four codefendants
[2] ER Vol.4, p.51; RT 2/5/13, p. 45-65.

Third, defense counsel did not object to the prosecutor's prejudicial vouching in closing arguments. The vouching was that the prosecutor would face federal criminal charges for suborning perjury if his witnesses committed perjury.[1]

Fourth, defense counsel should have demanded full pretrial hearings related to the coconspirator hearsay statement by Karla Prieto. This statement should not have been litigated in a rush simultaneous with the trial itself, and defense should have objected to the ruling being under advisement[2] as the trial was proceeding and the jury was being exposed to such prejudicial evidence. *US v. McElmurry*, 2015 WL 305274, (9th Cir. Jan. 26, 2015).

An effective way to discover coconspirator statements is to demand production for purposes of pretrial rulings on the admissibility of the statements against your client. Because the wrongful admission of the statements may require a mistrial, see *US v. Dunn*, 564 F.2d 348 (9th Cir. 1977), it is preferable to make the determination prior to trial, and *McElmurry* supports that reasoning. Because the statements are so prejudicial, defense counsel should request a pretrial hearing outside the presence of the jury under Federal Rule of Evidence 104 to determine whether the government can make a sufficient showing that the

---

[1] ER. Vol. 4, p. 100-102; RT 2/13/13, p.85, 92, Excerpt of Government Closing Argument. See also pp 86 and 87 where Government doesn't dispel his p.85 vouching but rather bolsters his witness's credibility.

statements are admissible under the coconspirator hearsay exception. By insisting on a pretrial hearing well before trial, Defense may furthermore have also forced the Government into timely disclosure that the statement was denied by the declarant, Tiznado.

Fifth, Defense counsel should have brought a formal written and oral motions for a prosecution witness list well before trial and made a showing of need and materiality based on surprise avoidance and the defendant's rights of confrontation and cross-examination.

## CONCLUSION STATING THE PRECISE RELIEF SOUGHT

For the reasons stated herein, Appellant requests that the conviction be reversed and the case be remanded for a new trial.

If the Court does not find merit for a new trial, we request that the Court remand the matter for a resentencing based upon the arguments presented herein.

Lastly, regardless of the above rulings of the Court, we request a remand for resentencing under the new retroactive U.S.S.G. 2D1.1 and 2D1.11 guidelines.

Respectfully submitted this 15th day of July, 2015.

LAW OFFICES OF WILLIAMSON & YOUNG, P.C.

*s/ Kathleen G. Williamson*
Kathleen G. Williamson
Attorney for Luis Carlos Vasquez

63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains more than 14,000 words (15, 498 exactly, including footnotes) excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief is does, however, comply with the Order (docket 30, June 25, 2015) allowing an enlargement for an opening brief that does not exceed 15,500 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman.

Dated July 15, 2015.

*s/Kathleen G. Williamson*
Kathleen G. Williamson
Attorney for Defendant/Appellant

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 15, 2015.                              .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

Luis C Vasquez
USM # 15483-196
FCI Yazoo City Low
Federal Correctional Institution
P.O. Box 5000
Yazoo City, MS 39194

Dated July 15, 2015

_s/Kathleen G. Williamson_
Kathleen G Williamson
Attorney for Defendant/Appellant